```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| IN RE<br><br>DAVID HLYWIAK, as owner of<br>Vessel M/V 50/50 for Exoneration<br>from or Limitation of Liability.<br>-------------------------------<br>J.J.C. BOATS, INC.,<br><br>      Plaintiff,<br><br>   v.<br><br>MARC HLYWIAK, DAVID HLYWIAK, and<br>JOHN DOES 1-10,<br><br>      Defendants.<br>-------------------------------<br>INDEMNITY INSURANCE COMPANY OF<br>NORTH AMERICA,<br><br>      Intervening Plaintiff. | HONORABLE JOSEPH E. IRENAS<br><br>CIVIL ACTION NO. 06-2504<br>        (JEI)<br><br>**OPINION** |

**APPEARANCES:**

BARRY, CORRADO, GRASSI & GIBSON, P.C.
By: Stephen W. Barry, Esq.
2700 Pacific Avenue
Wildwood, NJ 08260
    Counsel for Plaintiff

CASEY & BARNETT LLP
By: Gregory G. Barnett, Esq.
317 Madison Avenue, 21st Floor
New York, NY 10017
    Counsel for Intervening Plaintiff

RUBIN FIORELLA & FRIEDMAN, LLP
By: James E. Mercante, Esq.
   Michael E. Stern, Esq.
292 Madison Avenue
New York, NY 10017
    Counsel for Defendants

**IRENAS,** Senior District Judge:

Presently before the Court is a Motion for Summary Judgment filed by Defendants David and Marc Hlywiak (the "Hlywiaks") (Docket No. 25). This case involves a marine collision between two vessels operating off the coast of Cape May, New Jersey.[1] The Hlywiaks' Motion raises the issue of damages only and does not address any issues of liability in connection with the collision. For the reasons stated below, this Court will grant the Motion.

**I.**

Because liability is not addressed by this Motion, the details of the collision are limited and undisputed. On July 1, 2005, a vessel called "50/50" collided with a vessel called "Twilight" off the coast of Cape May, New Jersey. Defendant David Hlywiak owned the 50/50, and his son, Defendant Marc Hlywiak, was operating the boat at the time of the collision. Plaintiff J.J.C. Boats, Inc. ("J.J.C. Boats") owned the Twilight. (Dfs' Ex. 1.)

At the time of the collision, the Twilight was covered by a hull and liability insurance policy issued by Indemnity Insurance Company of North America ("INA"). The policy had an agreed hull

---

[1] The Court has jurisdiction over this civil case of admiralty under 28 U.S.C. § 1333. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2).

2

valuation of two hundred thousand dollars ($200,000). (Dfs' Ex. 2.)[2] J.J.C. Boats submitted a claim of loss to INA, and INA's claims adjuster subsequently obtained a surveyor and sought an estimate of damages sustained by the Twilight. (*See* Pl's Ex. A.) On August 16, 2005, Yank Marine, Inc. provided an estimate for repairs to the Twilight based on a field survey report by Bruce Pickard. (Dfs' Ex. 4; Pl's Ex. B.) The total repair cost estimate was $197,272. (Dfs' Ex. 4.)

On October 24, 2005, J.J.C. Boats submitted to INA a signed proof of loss for the total value of the policy, i.e., $200,000.[3] (Dfs' Ex. 5.) As part of the sworn statement of proof of loss, J.J.C. Boats purported to reserve "its right to recover its losses from the tortfeasor, subject to the subrogation rights of [INA]" because it asserted that the value of the Twilight was greater than the value of the insurance policy. (*Id.*; *cf.* Pl's Dipper Aff. (detailing costs of improvements, repairs, and

---

[2] The copy of the policy provided to the Court indicates a period of coverage from November 12, 2001, through November 12, 2002. However, there is no dispute between the parties that the Twilight was covered by an identical policy on July 1, 2005, the date of the collision.

[3] Though it is not clear from the record exactly why J.J.C. Boats submitted a proof of loss that was greater than the estimated repair costs, it seems likely that J.J.C. Boats submitted a claim for the total value of the policy, rather than waiting for the boat to be repaired, "to help [itself] get back into business more quickly." (Pl's Ex. A.) Evidence in the record also indicates that INA and its claims adjuster were well aware of all relevant facts, including the field survey report and repair cost estimate, when evaluating the claim. (*Id.*)

maintenance performed on the Twilight between 2000 and 2004).) INA paid J.J.C. Boats the full $200,000 value of the policy. (Dfs' Ex. 3, ¶ 4.)  After J.J.C. Boats received payment under the insurance policy, INA obtained title to the Twilight and sold the vessel for a salvage return of $29,650.  (*See* Dfs' Ex. 6.)[4]

On January 31, 2008, the Hlywiaks filed this Motion for Summary Judgment seeking to preclude J.J.C. Boats from claiming damages in excess of the $200,000 it already received from INA. J.J.C. Boats argues that it should not be barred from recovering additional damages from the Hlywiaks despite its recovery under INA's hull insurance policy.  J.J.C. Boats recognizes that it cannot recover damages from the Hlywiaks up to the $200,000 it received from INA since that would constitute an impermissible double recovery.  Rather, J.J.C. Boats seeks to recover from the Hlywiaks the *difference* between the fair market value of the Twilight immediately prior to the collision, which it claims exceeded $200,000, and the value of the INA insurance policy.  It also claims it is entitled to unspecified damages for loss of use

---

[4] The terms of the INA policy provide: "Upon making payment under this policy [INA] shall be vested with all of [J.J.C. Boats'] rights of recovery against any person, corporation, vessel or interest and [J.J.C. Boats] shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights."  (Dfs' Ex. 2, lines 108-09.)  Based on these vested rights, the Court granted INA's motion to intervene in this action on January 10, 2006.  (Docket No. 9.)  The Hlywiaks state that they have amicably settled the claims with INA, (Dfs' Br. at 4), presumably through their insurance carrier Travelers Insurance Company (*see* Dfs' Ex. 6).

of the vessel.

**II.**

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the nonmoving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). "'With respect to an issue on which the nonmoving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Pub. Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*, 477 U.S. at 325). The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III.

Two categories of cases arise when determining damages from a collision between maritime vessels: (1) a total loss of a vessel; and (2) a partial loss of a vessel. *See The Umbria*, 166 U.S. 404, 421 (1897); *see also Calmar S.S. Corp. v. Scott*, 209 F.2d 852, 853-54 (2d Cir. 1954). The general rule is that

> in cases of total loss by collision, damages are limited to the value of the vessel with interest thereon, and the net freight pending at the time of the collision. The probable net profits of a charter may be considered in cases of delay occasioned by a partial loss, where the question is as to the value of the use of the vessel pending her repairs. . . . But in cases of total loss the probable profits of a charter not yet entered are always rejected.

*The Umbria*, 166 U.S. at 421; *see also Standard Oil Co. of N.J. v. S. Pac. Co.*, 268 U.S. 146, 155 (1925) ("In case of total loss of a vessel, the measure of damages is its market value, if it has a market value, at the time of destruction."). Specifically, this case involves a *constructive* total loss.[5] "A vessel is considered a constructive total loss when the cost of repairs is greater than the fair market value of the vessel immediately before the casualty." *Ryan Walsh Stevedoring Co. v. James Marine Servs., Inc.*, 792 F.2d 489, 491 (5th Cir. 1986).

The Hlywiaks argue that the Twilight's fair market value at the time of the accident is limited to the $200,000 value of the

---

[5] A constructive total loss should be distinguished from an actual total loss which would occur, for example, when a vessel sinks to the bottom of the ocean and cannot be recovered.

INA hull insurance policy. J.J.C. Boats counters that the fair market value of the Twilight was greater than $200,000, though it fails to provide any evidence from which the Court can adequately reach this conclusion.[6] Based on the estimate provided by Yank Marine, Inc., the cost of repairs to the Twilight would have been $197,272. Regardless of whether the Court accepts the Hlywiaks' argument or the unsubstantiated assertion of J.J.C. Boats, the cost of repairs was less, not greater, than the fair market value of the Twilight immediately before the casualty. Thus, a strict comparison between the cost of repairs and either alleged fair market value of the Twilight leads to the conclusion that there was not *necessarily* a constructive total loss based on the monetary amounts alone.

In *Calmar S.S. Corp. v. Scott*, Judge Learned Hand discussed at length the theory of the doctrine of constructive total loss, stating:

> [W]hen a ship is wrecked, but not lost or broken up into

---

[6] J.J.C. Boats purports to rely on an affidavit of Martin Dipper to establish this fact. The affidavit details several improvements, repairs, and maintenance performed on the Twilight between 2000 and 2004, but there is no evidence in the record that establishes how much the Twilight was worth when it was initially purchased by J.J.C. Boats in 1999, or how much the various improvements increased the value of the vessel. The parties also reference a report by J.J.C. Boats' expert, which allegedly concludes that the Twilight was worth more than $200,000 at the time of the collision, though neither party has provided the Court with a copy of this report. However, as will become apparent below, the exact market value of the Twilight is immaterial to the Court's decision.

> such fragments that it ceases to be a ship at all, an insurer is liable only for the expense of restoring her to her former condition.  On the other hand, if she is on a strand and has become innavigable as she lies, it is often true that for practical purposes this expense is not full indemnity, for the insured has neither the immediate benefit of the ship, nor of the expense, whose payment after long delay may be very far from making him whole.  To meet what would otherwise be a failure of the policy to accomplish its purpose, the doctrine of 'constructive total loss' was devised, *which gives the insured the privilege of compelling the insurer to pay the full amount at once in exchange for the transfer of the wreck*.

209 F.2d at 854 (emphasis added).  The *Calmar* court held that the owner of a damaged steamer was permitted to abandon its vessel and claim a constructive total loss under an insurance policy even though the cost of repairs did not exceed the insured value of the vessel.[7]  *Id.*  According to Judge Hand, this "privilege . . . . is granted to relieve the owner of the embarrassment of having upon his hands a ship, completely useless as she lies, and being without remedy until such time as she can be recovered and repaired, which may mean an indefinite postponement."  *Id.*  The court reached its decision despite a clause in the insurance policy that expressly stated: "'No recovery for a Constructive

---

[7] The Second Circuit, recognizing that this doctrine might be subject to abuse by the insured, noted that "the condition was imposed that there must be some relation between the extent of the injury and the value of the ship, when restored."  *Calmar*, 209 F.2d at 854.  Here, the Court does not need to consider this condition because there is no issue as to the propriety of J.J.C. Boats submitting a claim to INA for the insured value of the Twilight, even though the cost of repairs did not exceed that value.

Total Loss shall be had hereunder unless the expense of recovering and repairing the vessel shall exceed the insured value.'"[8]  *Id.* at 853.

In this case, as in *Calmar*, J.J.C. Boats had a choice when it submitted its proof of loss to INA. It could have claimed a partial loss of the Twilight, thereby seeking to have the vessel repaired by Yank Marine for $197,272 and entitling it to damages for "the value of the use of the vessel pending her repairs." *The Umbria*, 166 U.S. at 421. But of course if J.J.C. Boats chose this option, it would have been without the immediate benefit of its vessel while the repairs were completed. Alternatively, J.J.C. Boats could have claimed a constructive total loss and sought the full $200,000 value of the INA policy. However, as part of the privilege of receiving the full amount of the policy at once and avoiding payment after a long delay, J.J.C. Boats was required to abandon the Twilight and transfer title to INA.

J.J.C. Boats, after considering its options, decided to claim a constructive total loss of the Twilight, receive the $200,000 value of the INA policy, and transfer title to INA. Accordingly, J.J.C. Boats is not permitted to now seek damages from the Hlywiaks for its loss of use of the Twilight because such damages are only permitted in cases of partial loss. This

---

[8]  A similar provision existed in the INA hull insurance policy covering the Twilight. (Dfs' Ex. 2, lines 135-36.)

9

conclusion, however, still fails to answer J.J.C. Boats' argument that it is entitled to claim damages for the difference between the fair market value of the Twilight prior to the collision and the value of the INA policy.  J.J.C. Boats asserts that not allowing it to recover the fair market value of the vessel, which allegedly exceeded $200,000, would constitute a confusion between "the concept of constructive total loss for *insurance* purposes [and] the concept of constructive total loss for *tort damages* purposes."  *Self Towing, Inc. v. Brown Marine Servs., Inc.*, 837 F.2d 1501, 1506 (11th Cir. 1988).

   *Self Towing* involved a dispute between the owner of a tugboat and a bareboat charterer and its insurance company. After a collision, for which the Eleventh Circuit affirmed that the owner of the tugboat was solely liable, the bareboat charterer declared a constructive total loss pursuant to its hull insurance policy.  *Id.* at 1502-03.  The district court determined that the vessel under bareboat charter had a fair market value of $225,000.  *Id.* at 1506.  The vessel was insured for $70,000, and two repair bids obtained by the insurance company were for $70,854.16 and $98,000.  *Id.*  Because the estimated repair costs exceeded the $70,000 insured value, the district court awarded damages equal to the $225,000 fair market value of the vessel. *Id.*  The Eleventh Circuit reversed, agreeing with the owner of the tugboat that it should only be liable for a partial loss

rather than a total loss because the cost of repairs was not greater than the fair market value of the vessel immediately before the casualty, i.e., there was no constructive total loss. *Id.* (citing *Ryan Walsh*, 792 F.2d at 491).

*Self Towing* presented a unique situation in which the cost of repairs fell *between* the insured value and the proven fair market value of the damaged vessel, and the Eleventh Circuit rendered a decision effectively *reducing* the amount of damages plaintiffs-appellees were entitled to recover.  This Court agrees that a district court decision finding a constructive total loss based on a vessel's insured value, but then allowing damages based on the same vessel's higher fair market value is not equitable.  *Cf. Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 96-97 (1981) (recognizing the federal judiciary's "authority to fashion flexible and equitable remedies in admiralty" (citing *United States v. Reliable Transfer Co.*, 421 U.S. 397, 409 (1975))).

But in this case, the cost of repairs fell *below both* the insured value and the fair market value of the Twilight. Nonetheless, J.J.C. Boats invoked its privilege to declare a constructive total loss of the Twilight under the INA hull insurance policy, for which it recovered.  J.J.C. Boats now seeks to recover *increased* damages from the Hlywiaks even though it surrendered title to the Twilight in exchange for the full value

11

of the policy. This surrender of title was an abandonment of the Twilight by J.J.C. Boats, which has significant consequences.

In *Continental Insurance Co. v. Clayton Hardtop Skiff*, the Third Circuit stated:

> Upon receiving notice of abandonment, the underwriter may accept or reject the abandonment. If he accepts, he becomes at once liable for the whole of his insurance, and also becomes entitled to all rights which the insured possessed in the thing insured. He acquires the same title to the abandoned vessel as he might have acquired by purchase. He may save and repair her, sell her, or otherwise do as he will with her. If the injury to the vessel was due to the tort of another, the insurer's right of subrogation, heretofore limited to the amount of payments made by him, becomes extended by abandonment to the full amount recoverable from the tortfeasor, even though that may exceed the amount of insurance paid.

367 F.2d 230, 234 (3d Cir. 1966) (citation and internal quotation marks omitted).[9] The Third Circuit cited Judge Hand's opinion in *Calmar* extensively, concluding that "when the insurer has accepted the application of the doctrine of constructive total loss the insurer becomes the transferee of the vessel and the insured *in effect loses his interest therein*." *Id.* (emphasis added).

J.J.C. Boats' abandonment of the Twilight to INA vested the insurance company with all claims and rights for the constructive

---

[9] *See also Mason v. Marine Ins. Co.*, 110 F. 452, 460 (6th Cir. 1901) ("Inasmuch as it is a consequence of [an] abandonment [by the owner of a vessel] that the underwriter becomes substituted to all claims and remedies for the loss, in addition to the title to the ship itself, it is impossible to say that the owner may still recover to his own use damages which depend upon his right to continued ownership.").

total loss of the vessel.  This includes any claim for damages from the Hlywiaks that might exceed the value of the insurance policy.  However, as *Continental Insurance* states, J.J.C. Boats lost its interest in the Twilight after INA accepted a constructive total loss of the vessel, and it cannot now seek damages for the fair market value of the Twilight even if that value exceeds $200,000.  Accordingly, the Court holds that J.J.C. Boats is precluded from claiming any additional damages in excess of the value of the INA hull insurance policy which it already recovered.[10]

### IV.

For the reasons set forth above, the Court will grant the Hlywiaks' Motion for Summary Judgment.  The Court will issue an appropriate Order.

Dated: June 30, 2008

                                    s/ Joseph E. Irenas
                                    **JOSEPH E. IRENAS, S.U.S.D.J.**

---

[10] Based on the present record and the Hlywiaks' representation that they have settled all claims with INA, it appears that this decision effectively resolves the entire case. However, before ordering the case closed, the Court will require all parties, including INA, to submit a joint letter not to exceed five pages that provides a status of any remaining claims.

13